# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
JESSE LANGEL,

                   PLAINTIFF,

      -against-

DIETZ & WATSON, INC.,

                DEFENDANT.
------------------------------------------------------------X

Index No.:

**SUMMONS**

The basis of venue is the plaintiff's residence.

Plaintiff's residence: 105 Lexington Avenue, 5B, New York, NY 10016.

To the Person Named as Defendant above:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff at the address set forth below, and to do so within 20 days after the

service of this summons, exclusive of the day of service (or within 30 days after the service is

complete if this summons is not personally delivered to you within the State of New York); and

in case of your failure to appear or answer, judgment will be taken against you by default for the

relief demanded in the complaint.

Note:  The law or rules of court provide that:

    a) If this summons us served by its delivery to you or (for a corporation) an agent authorized
       to receive service personally within the State of New York, you must answer within 20
       days after such service; or
    b) If this summons is served otherwise than a designated in subdivision (a) above, you are
       allowed 30 days to answer after the proof of service is filed with the clerk of the court.
    c) You are required to file a copy of your appearance together with proof of service with the
       clerk of the court of the court in which the action is brought within ten days of the service
       of the appearance.

Dated: November 13, 2021

Defendant's address:

Dietz & Watson, Inc.
5701 Tacony Street
Philadelphia, PA 19135

Jesse Langel, Esq.
*Pro se*
30 Wall Street, 8th Floor
New York, NY 10005
646-290-5600

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
JESSE LANGEL,                                                                 Index No.:

                              PLAINTIFF,

            -against-                                               **VERIFIED COMPLAINT**

DIETZ & WATSON, INC.,

                              DEFENDANT.
-----------------------------------------------------------X

Plaintiff, Jesse Langel, hereby complains of the defendant as follows:

## INTRODUCTION

1.      This is an action for money damages and injunctive relief by an individual consumer for

deceptive acts and practices (NYGBL § 349), false advertising (NYGBL § 350), common law

negligence, and gross negligence.

## PARTIES

2.      Plaintiff was and is a natural person residing in New York, N.Y.

3.      The defendant was and still is an unauthorized foreign business corporation organized

and existing by virtue of the laws of the State of Pennsylvania.

4.      The defendant's business headquarters is located at 5701 Tacony Street, Philadelphia, PA

19135.

5.      The defendant's principal place of business is located at 5701 Tacony Street,

Philadelphia, PA 19135.

6.      The defendant is not registered to do business with the New York Secretary of State.

7.      The defendant is a meat processor.

8.      The defendant is a meat preparer.

2

9.      The defendant packages, labels, distributes, sells and advertises meat products in the State of New York.

10.     In calendar year 2020, the defendant, through itself, through agent(s), through reseller(s), and/or through wholesalers sold over 100,000 meat products in New York State.

11.     In calendar year 2020, the defendant, through itself, through agent(s), through reseller(s), and/or through wholesalers sold over 1,000,000 meat products in New York State.

12.     The defendant regularly does business within this county and state.

13.     The defendant is engaged in a persistent course of conduct within this county and state.

14.     The defendant derives substantial revenue from goods sold in this county and state.

15.     The defendant derives substantial revenue from interstate commerce.

16.     The defendant expected or should have reasonably expected that the acts alleged in this complaint would have consequences in this county and state.

17.     The defendant purposefully avails itself of the privileges and benefits of this county and state.

18.     The defendant caused transactions and occurrences alleged in this complaint to take place in this county and state.

## FACT ALLEGATIONS

19.     On October 12, 2021, the plaintiff purchased 6 ounces of packaged chicken-breast slices containing bar code 031506616297 encased in the defendant's package ("the product").

20.     The purchase was made at D'Agostino Supermarkets, Inc. located at 341 Third Avenue, New York, NY 10010 ("the store").

21.     The Invoice number is 00112681 and the TS number is 127532.

22.     The plaintiff paid $8.99 for the product.

   A.     **The Advertising Claims at Issue**

3

23. Among other information and representations, on the package itself, were the following

representations:

D&W VERIFIED
HUMANELY RAISED*

*DIETZ & WATSON DEFINES HUMANELY RAISED AS CHICKENS RAISED
IN A HEALTHY, REDUCED STRESS ENVIRONMENT THAT PROMOTES
ANIMAL WELFARE AND NATURAL BEHAVIOR. THEY THRIVE ON
WHOLESOME FEED WITH VITAMINS, MINDERALS, AND ABUNDANT
FRESH WATER.

24. True and accurate photographs of the front and back of the package are annexed hereto as

Exhibit A ("the product") and is incorporated by reference.

25. In this complaint, the plaintiff refers to the above written language contained on Exhibit

A as the above "statement(s)," "sentence(s)," "representation(s)," "claim(s)," "advertising

claims," and "misrepresentations."

26. The above statements are claims.

27. The above statements are advertising claims.

28. The above statements are representations.

29. The above statements are assertions of fact.

30. The above statements are advertising.

31. The above statements were made as part of the defendant's marketing activities.

32. The above statements were made to affect consumer decision making.

33. The above statements are issue advertising.

34. The above statements are ideological advertising.

35. The above statements are brand advertising.

36. The above statements are image advertising.

37. The above statements are informational advertising.

38. The above statements are part of the product's label.

4

39.    The above statements are not part of the product's label.

40.    The defendant, through itself or through its agents, created the above statements.

41.    The defendant, through itself and/or through its agents, created the package on which the statements were made.

42.    The defendant, through itself and/or through its agents, created the label that appears on the packaging.

43.    The defendant manufactured, packaged, labeled, distributed, sold and advertised the above product.

44.    The defendant is legally responsible for any judicially declared liability arising from the above statements.

45.    The advertising claims were strategically placed on the package.

46.    The plaintiff purchased the product because of the above representations.

47.    The plaintiff was materially misled by the above representations.

48.    The plaintiff was reasonably misled by the above representations.

49.    The plaintiff was part of a particular consumer group targeted by the defendant.

50.    The defendant's advertising claims contain targeted express and implied claims that are aimed at particular consumers who have particular values as to animal welfare.

51.    The particular consumer group that the plaintiff is within is a group that is concerned with the humane treatment of animals in the animal-production process.

52.    The defendant knew, or had reason to know, that the plaintiff would likely be affected by the advertising claims.

53.    The plaintiff was directly affected by the advertising claims as intended by the plaintiff.

54.    The advertising claims induced the plaintiff's purchase of the product.

55.     The defendant placed the product with the above advertising claims into the stream of
commerce in order help influence the sale of the product.

56.     The product, because of its representations, stood out conspicuously as compared to
competing products.

57.     This year, the plaintiff has developed more awareness and compassion for animal
welfare.

58.     The defendant's website contains the advertising claim "we advocate for animal welfare."

59.     This year, the plaintiff has gained more knowledge and insight about the health
consequences of meat consumption by human beings.

60.     In New York, NY, where the plaintiff resides, the defendant distributes, sells, and
markets its products using the above representations in retail establishments such CVS
Pharmacy, Rite Aid, D'Agostino Supermarkets, Duane Reade, and Gristedes.

61.     The plaintiff often frequented and shopped at CVS Pharmacy, Duane Reade, and
D'Agostino Supermarkets before the purchase.

62.     The plaintiff has seen the defendant's products placed inside of CVS Pharmacy, Duane
Reade, and D'Agostino Supermarkets.

63.     Shortly after the purchase, the plaintiff suffered injuries because of the representations,
which are alleged to be false, misleading, and deceptive.

**B.      Why the Defendant's Advertising Claims are False, Misleading, and
         Deceptive**

64.     The defendant's "Humanely Raised" claims are false as a matter of plain logic.

65.     "Humane" animal production is a factual impossibility.

66.     In absolute terms, animal production is inherently inhumane and can, *eo ipso*, not be
humanized.

6

67.    Allegedly "humane production" of chickens regularly involves severe forms of violence against the animals, such as intensive confinement, debeaking without anesthesia, forced breeding, mutilations, and denial of normal socialization.

68.    Minimally, every kind of animal production will inevitably culminate in the ultimate act of violence: the involuntary and premature death of the animal.

69.    The defendant's definition of "Humanely Raised" conflicts with the literal definitions of "humane" and "humanely" as defined in the Merriam-Webster dictionary: "marked by compassion, sympathy, or consideration for humans or animals."

70.    The defendant's definition of "Humanely Raised" conflicts with the literal definitions of "humane" and "humanely" as defined in Oxford Languages dictionary: having or showing compassion or benevolence.

71.    The defendant's definition of "Humanely Raised" alters and restricts the literal definitions of "humane" and "humanely" as defined in dictionaries, Merriam-Webster and Oxford Languages.

72.    The defendant's advertising claims are false as a matter of law.

73.    The defendant's use of the word *verified* as in "D&W VERIFIED HUMANELY RAISED*" legally renders all claims related thereto as establishment claims, including all assertions in its definition, since it suggests that scientific proof verified its verification process.

74.    An establishment claim is a claim that contains express or implied statements regarding the amount of support the advertiser has for the product claim.

75.    The defendant's verified claims suggest that it possessed scientific proof establishing that its suppliers' practices medically caused the animal-welfare outcomes as asserted in the claims.

76.    Since the defendant "verifies" the claims, it must already possess evidence sufficient to satisfy the relevant scientific community of the truths of its claims.

7

77.     Mirriam-Webster dictionary defines the verb *verify* as 1) to establish the truth, accuracy, or reality of; 2) to confirm or substantiate in law by oath.

78.     Cambridge.org defines the verb *verify* as 1) to prove that something exists or is true, or to make certain that something is correct.

79.     The defendant's "VERIFIED" claim that the subject chickens were CHICKENS RAISED IN A HEALTHY, REDUCED STRESS ENVIRONMENT THAT PROMOTES ANIMAL WELFARE AND NATURAL BEHAVIOR" is an establishment claim.

80.     Upon information and belief, adequate and sufficiently reliable tests do not establish the defendant's express claims and implied claims that the subject chickens were "CHICKENS RAISED IN A HEALTHY, REDUCED STRESS ENVIRONMENT THAT PROMOTES ANIMAL WELFARE AND NATURAL BEHAVIOR."

81.     The defendant's claim that "THEY THRIVE ON WHOLESOME FEED WITH VITAMINS, MINDERALS, AND ABUNDANT FRESH WATER" is an establishment claim.

82.     Upon information and belief, adequate and sufficiently reliable tests do not establish the defendant's express claims and implied claims that "THEY THRIVE ON WHOLESOME FEED WITH VITAMINS, MINDERALS, AND ABUNDANT FRESH WATER."

83.     The defendant's claim that the subject chickens were raised in a "HEALTHY, REDUCED STRESS ENVIRONMENT" is an establishment claim.

84.     Upon information and belief, adequate and sufficiently reliable tests do not establish the defendant's express and implied claims that the subject chickens were raised in a "HEALTHY, REDUCED STRESS ENVIRONMENT."

85.     The defendant's claim that the subject chickens were raised in a "REDUCED STRESS ENVIRONMENT" is an establishment claim.

8

86.     Upon information and belief, adequate and sufficiently reliable tests do not establish the
defendant's express and implied claims that the subject chickens were raised in a "REDUCED
STRESS ENVIRONMENT."

87.     The defendant's claim of a "REDUCED STRESS ENVIRONMENT" is a dangling
comparison.

88.     The defendant's claim of a "REDUCED STRESS ENVIRONMENT" is a dangling
comparison because it fails to reference the prior environment used as a reference point.

89.     The defendant's claim of a "REDUCED STRESS ENVIRONMENT" is an establishment
claim.

90.     Upon information and belief, adequate and sufficiently reliable tests do not establish the
defendant's express claims and implied claims that the subject chickens were raised in a
"REDUCED STRESS ENVIRONMENT."

91.     The defendant's claim of "REDUCED STRESS" is a dangling comparison.

92.     The defendant's use of the phrase "REDUCED STRESS" is a dangling comparison
because it fails to quantify the prior stress used as a reference point.

93.     The defendant's use of the phrase "HEALTHY, REDUCED STRESS ENVIRONMENT"
is a dangling comparison.

94.     The defendant's use of the phrase "HEALTHY REDUCED STRESS ENVIRONMENT"
is a dangling comparison because it fails to reference the prior environment used as a reference
point.

95.     The defendant does not define "HEALTHY."

96.     The defendant's use of the word "HEALTHY" is an establishment claim.

97.     Upon information and belief, adequate and sufficiently reliable tests do not establish the
defendant's proposition, "HEALTHY."

9

98.     The defendant does not provide a reference against which "HEALTHY" can be

reasonably measured.

99.     The defendant does not define "HEALTHY, REDUCED STRESS ENVIRONMENT."

100.    The defendant does not define "STRESS."

101.    The defendant does not give reasonable consumers acting reasonably any indication how

it verifies the reduction of any of its chickens' relevant stress-factors including:

   a) Physical stress: Pain, damage from catching, immobilization, weighing, grading,
      debeaking, vaccination, transport;

   b) Physiological stress: By fear, poor husbandry/harsh caretakers;

   c) Climatic stress: Extreme heat and cold, High humidity;

   d) Environmental stress: Poor brooding conditions by bright/low light, noise; wet litter;
      inadequate ventilation; high air speed; deterioration of the air quality (high levels of
      $CO/CO_2$, $NH_3$); type of housing (cages, free range);

   e) Nutritional stress: Dramatic diet composition change; variation in nutrient content, long
      or uneven feed distribution, sex separate feeding, starvation, poor pellet/dusty feed,
      dehydration, ant-nutritional factors (glucans, xylans, galactomannans, tannins,
      gizzerosine, putrescene etc), fat oxidation, fungal/microbial toxins, toxic medications;

   f) Pathological stress: Contaminated premises by built-up litter, early exposure to various
      infectious agents, clinical/sub-clinical infections due to poor bio-security and sanitation,
      vaccination/excessive activation of the immune system resulting in an immunological
      stress, post-vaccinal reactions (reduced feed intake/fever);

   g) Social stress: High stocking density, limited feeding/drinking space, as-hatched growing,
      poor uniformity, pecking order;

   d) Psychological stress: By fear, poor husbandry/harsh caretakers.

102.    The defendant does not define "ANIMAL WELFARE."

103.    The defendant does not define "NATURAL BEHAVIOR."

104.    The defendant does not define "THRIVE."

105.    The defendant does not define "WHOLESOME."

106.    The defendant does not clarify further on its packaging how its "D&W VERIFIED

HUMANELY RAISED" chickens are "CHICKENS RAISED IN A HEALTHY, REDUCED

STRESS ENVIRONMENT THAT PROMOTES ANIMAL WELFARE AND NATURAL

BEHAVIOR."

107.    The defendant does not provide another information source to explain how its D&W

VERIFIED HUMANELY RAISED chickens are "CHICKENS RAISED IN A HEALTHY,

REDUCED STRESS ENVIRONMENT THAT PROMOTES ANIMAL WELFARE AND

NATURAL BEHAVIOR."

108.    The defendant does not clarify further on its packaging how "THEY THRIVE ON

WHOLESOME FEED WITH VITAMINS, MINDERALS, AND ABUNDANT FRESH

WATER."

109.    The defendant does not provide another information source to explain how "THEY

THRIVE ON WHOLESOME FEED WITH VITAMINS, MINDERALS, AND ABUNDANT

FRESH WATER."

110.    The defendant's use of the word "THRIVE" in the context used is literally false.

111.    The defendant's use of the word "THRIVE" is false by necessary implication.

112.    On Exhibit 1, the placement of "D&W VERIFIED HUMANELY RAISED" is in the

middle of the package, next to, and at the level of, "CERTIFIED ORGANIC," which falsely

implies that both claims are related to each other.

113.    On Exhibit 1, the placement of "D&W VERIFIED HUMANELY RAISED" is in the

middle of the package, next to, and at the level of, "CERTIFIED ORGANIC," which falsely

implies that both claims are roughly equivalent or related in certification strength

114.    The placement of "D&W VERIFIED HUMANELY RAISED" is made center in the middle of package, which draws the eye of the reasonable consumer to that claim, as it did the plaintiff.

115.    The font size of "D&W VERIFIED" is smaller than the font size of "HUMANELY RAISED."

116.    The font size of "D&W VERIFIED" is less noticeable than the font size of "HUMANELY RAISED."

117.    The claim, "D&W VERIFIED" is less noticeable than the claim, "HUMANELY RAISED."

118.    The larger font emphasizes "HUMANELY RAISED" while the smaller font de-emphasizes "D&W VERIFIED."

119.    The defendants uses its "D&W VERIFIED HUMANELY RAISED" claims on at least 25 different product types.

120.    Upon information and belief, reasonable consumers acting reasonably would make purchasing decisions based on the more noticeable claim, "HUMANELY RAISED" as depicted with the larger font.

121.    Upon information and belief, reasonable consumers acting reasonably would make purchasing decisions without understanding what "D&W VERIFIED" means.

122.    Upon information and belief, reasonable consumers acting reasonably would make purchasing decisions without noticing "D&W VERIFIED."

123.    Upon information and belief, reasonable consumers acting reasonably would not notice the asterisk after "HUMANELY RAISED" because it is too small.

12

124.    Upon information and belief, reasonable consumers acting reasonably would interpret the larger-font claim, "HUMANELY RAISED," to imply that a third-party verified the express and implied claims of "HUMANELY RAISED."

125.    The defendant's use of "D&W VERIFIED HUMANELY RAISED" implies that the defendant itself raises the animals, or actively participates in the raising of the animals it uses in its products.

126.    Upon information and belief, the defendant does not raise chickens.

127.    Upon information and belief, the defendant does not raise chickens on property that it owns.

128.    The defendant did not raise the chicken, the body of which was contained in the package serving as Exhibit 1.

129.    Since the defendant's advertising claims are logically impossible, the defendant lacks reasonable bases to make any of the above claims regardless of whether they are establishment claims or efficacy claims.

130.    Since the defendant's advertising claims are logically impossible, they cannot be proven true with scientific substantiation.

131.    The defendant's use of its own verification process as to humaneness is less rigorous than the verification or certification process of a third party.

132.    Upon information and belief, based on the claims themselves, based the facts underlying the claims, based on industry practices, and based on the lack of a response to the plaintiff's FOIL request made to the USDA, the defendant has failed to submit to FSIS the level of scientific substantiation needed to support its advertising claims.

133.    The defendant's advertising claims are literally false.

134.    The defendant's advertising claims are false by necessary implication.

13

135.    The defendant's advertising claims are ambiguous.

136.    The defendant lacked reasonable bases for the above advertising claims.

137.    The defendant's sought marketing messaging through its advertising claims is
unambiguous.

138.    The defendant's advertising claims are misleading.

139.    The first and second sentences of the second paragraph of the above representations
contradict each other in both terms and literal meaning.

140.    The first and second sentences of the second paragraph of the above representations
positioned together are misleading to a reasonable consumer acting reasonably.

141.    Upon information and belief, the defendant's animal-husbandry practices fail to meet
industry standards.

142.    Upon information and belief, the defendant's suppliers' animal-husbandry practices fail
to meet industry standards.

143.    Upon information and belief, the defendant fails to provide a level of animal care that
meets consumer expectations.

144.    Upon information and belief, the defendant fails to provide a level of animal care that
meets scientifically established standards for humane animal treatment.

145.    Upon information and belief, the defendant's suppliers' fail to provide a level of animal
care that meets consumer expectations.

146.    Upon information and belief, the defendant's suppliers' fail to provide a level of animal
care that meets scientifically established standards for humane animal treatment.

147.    Upon information and belief, the defendant's suppliers' chickens are intensively confined
with thousands, or tens of thousands, of birds crowded in unsanitary warehouses and then
systematically mutilated.

14

148.    Rather than remedying any confusion about what the defendant meant by its definition, the definition only caused further confusion.

149.    Upon information and belief, neither the defendant nor its producers lack adequate third-party certification as to the humaneness of their animal treatment.

150.    The defendant's representations represent attempts at "humanewashing," which attempts to create the false impression that its practices, or its suppliers' husbandry practices are humane to animals when they are not.

### C.    Where the Defendant Allegedly Sources its "Raw Material" (Meat)

151.    The facts contained in this section are based upon information and belief.

152.    The defendant purchases ("sources") some or all of its poultry from The Shenandoah Valley in Virginia.

153.    The defendant refers to the meat that it sources as "raw material."

154.    The Shenandoah Valley is one of the top poultry producing and processing regions in the United States with about 250 turkey farms and 550 chicken farms.

155.    Much of that the Shenandoah Valley lies in Augusta, Page, Rockingham, and Shenandoah counties, which together raise more than 159 million chickens and 16 million turkeys a year.

156.    Agriculture in the Shenandoah Valley has increased in output over the past 40 years.

157.    As agriculture in the Shenandoah Valley has increased in output over the past 40 years, landowners work to produce more with limited acreage.

158.    As agriculture in the Shenandoah Valley has increased in output over the past 40 years, landowners work to produce more due to a drop in commodity prices.

159.    The raising of animals in the Shenandoah Valley, at least in some parts, are known as concentrated animal feeding operations (CAFOs).

160.    CAFOs enable farmers to house, feed, and care for large numbers of animals as economically as possible to meet increasing demand.

161.    Data on the number of animals per farm in the US suggests that over 99% of US farmed animals live on CAFOs, according to the Sentience Institute, relying on 2019 updated Census of Agriculture and EPA definitions.

162.    In the Shenandoah Valley, thousands of people are employed at approximately five chicken processing plants, two turkey plants, two poultry further processing or cooking plants, five poultry feed mills, and six hatcheries.

163.    Meat farmers in the Shenandoah Valley rely on industrial business practices.

164.    The number of animals killed per minute is a standard metric used at CAFOs.

165.    In CAFOs, welfare of the animals is secondary to the profits that their bodies turn.

166.    The Shenandoah Valley's animal production has led to the waste-management problem of manure overproduction.

167.    The Shenandoah Valley's animal production has led to the release of pollutants such as nitrogen and phosphorous to be released into surrounding bodies of water, which has led to excessive algae growth, and other ecological disturbances.

168.    The animals raised in the Shenandoah Valley generate more than 410,000 tons of poultry litter and approximately one billion gallons of liquid manure annually.

### D.    How Chickens Actually Live their Lives in Animal Production

169.    Even on "traditional" farms, chickens are known to suffer miserable existences with illnesses such as Marek's disease (Herpes), cancer, stuck eggs, reproductive tract infections, and other ailments that result from artificial breeding for hyperactive reproductive systems that make them lay an unnatural numbers of eggs.

16

170.    Chickens begin their lives in massive hatcheries alongside thousands of other chicks who are never allowed to meet their parents.

171.    After being transported from the hatcheries, both broilers and layer hens spend the rest of their lives in intensely crowded, and often unsanitary conditions.

172.    Lamps provide artificial heat to replace the warmth of the mother's body, where chicks would normally spend the first few days of life huddled beneath her wings.

173.    Chickens and turkeys raised for their meat are subject to ailments from years of genetic selection to grow at rapid speeds, including heart problems and broken bones, exacerbated by rough handling and transport, and they are subject to federally unregulated slaughter practices.

174.    The beaks of chickens, turkeys, and ducks are often removed in factory farms to reduce excessive feather pecking and cannibalism seen among stressed, overcrowded birds, according to The National Humane Society.

175.    The egg industry also kills male chicks as a matter of course soon after they are hatched, cuts off the ends of hens' beaks without anesthetic, and kills so-called "spent" hens after their approximately 24-month lifetime laying cycle under conditions that are not regulated by federal humane slaughter laws.

176.    95-98% of eggs come from hens raised in tiny wire "battery cages" too small for the animals to even spread their wings or lie down comfortably without touching another animal or the sides of their cages.

177.    Chickens reach slaughter weight—and the young age of 6-7 weeks—in half the time it took for their counterparts 50-60 years ago, and that weight is two-thirds larger that it was in 1950.

178.    The suffering caused to animals in animal production is inflicted on these animals as part of the inherent nature of the system.

17

179.    Per capital consumption of chicken has almost tripled since 1970.

180.    Chickens have been bred for rapid weight gain to meet this demand.

181.    Chickens are the most populous bird on the planet.

182.    Chickens are among the most abused birds on the planet.

183.    Poultry killed for their meat account for about 9 billion of the 10 billion animals killed for their food.

184.    Companies, such as the defendant and its supplier(s), are able to maximize productivity when animals are given little space, and their bodies have been genetically manipulated to grow faster.

185.    The realities of chicken animal production in which the defendant participated in to produce Exhibit 1 belies any reasonable construction of its advertising claims.

## E.     The USDA Label Process Fails Consumers by Allowing the Defendant to Use the Deceptive "Humanely Raised" Claims

186.    The USDA requires producers and processors to obtain pre-market label approval for animal-raising claims through application to its Food Safety and Inspection Service (FSIS).

187.    The USDA publishes a Labeling Guideline on Documentation Needed to Substantiate Animal-Raising Claims for Label Submission, last revised in December 2019.

188.    The Guideline explains that the USDA has not defined animal welfare claims, including "humanely raised," in regulations or policy guidelines.

189.    Instead, the USDA allows producers and processors to establish their own definition or employ a definition developed by another party.

190.    The USDA does not evaluate the relevance or appropriateness of third-party (independent) or second-party (industry) standards.

18

191.   The USDA suggests that applications for label approval include substantiation of any

animal welfare claims under FSIS's guidelines (December 2019): "Animal Welfare and

Environment Stewardship":

1.  A detailed written description explaining the meaning of the animal welfare or
    environmental stewardship claim and the controls used for ensuring that the raising claim
    is valid from birth to harvest; or the period of raising being referenced by the claim;

2.  A signed and dated document describing how the animals are raised to support that the
    claims are not false or misleading;

3.  A written description of the product tracing and segregation mechanism from time of
    slaughter or further processing through packaging and wholesale or retail distribution;
    and

4.  A written description for the identification, control, and segregation of nonconforming
    animals/product (e.g., how animals not raised in accordance with the specific animal
    welfare guidelines or stewardship program are segregated from animals eligible to bear
    the claim).

192.   The USDA does not independently verify compliance with animal-welfare claims on the

farm, during transport, or at slaughter.

193.   The USDA accepts audits of industry trade association minimum animal-care guidelines

as substantiation for these claims, according to reviews of USDA label approval files by the

Animal Welfare Institute.

194.   Upon information and belief, the USDA approved the defendant's claims shown above.

195.    The USDA has been known to approve animal-raising claims with little to no

substantiation.

196.   Upon information and belief, the USDA relies solely on "desk audits" and conducts no

on-site visits to verify compliance with its labeling policies.

197.   The USDA does not survey consumer perceptions of claims used by producers to ensure

that claims approved by the department meet consumer expectations.

198.    Because of the USDA's flawed process for label approval, producers—eager to derive

profits from taking advantage of consumer preferences—can make unsubstantiated claims on

their packages.

199.    Questionable substantiation claims may go unchallenged by the USDA, in part because it

has not adopted meaningful definitions for many animal-raising claims made on meat and

poultry products.

200.    The USDA's requirement that a producer define these claims on its packages does not

remedy the problem of inconsistency or transparency.

201.    In the *Federal Register* Notice, Product Labeling, 73, Fed. Reg. 60228, FSIS recognized

that its approval process doesn't provide for consistent definitions of animal production of label

claims:

> "[W]hile FSIS' approval of an animal raising claim depends on submissions that
> describe how the source animals were raised, animal producers and certifying
> entities may have different views on the specific animal production practices that
> qualify a product to bare a given animal raising claim on its label. Thus, the same
> animal raising claim may reflect different animal raising practices, depending on
> how an animal producer or certifying entity defines the basis for the claim."

202.    The FSIS acknowledged that agency staff do not go onto farms to ensure that label claims

are aligned with on-farm practices, according to a Transcript of record, FSIS, *Animal Raising*

*Claims* (Oct. 14, 2008).

203.    According to that transcript, employees are basing the approval of animal-raising claims

solely on documentation submitted by the producers, such as affidavits, certification, and

operational protocol.

204.    The defendant's label claims are kept secret since it has a financial interest in promoting

the product in the most marketable manner possible.

205.    The defendant has the financial motive to submit insufficient substantiation of its claims.

20

206.   Based on the allegations in this complaint, the defendant did not furnish adequate

substantiation per FSIS's guidelines (December 2019), "*Animal Welfare and Environment*

*Stewardship*."

207.   Upon information and belief, the defendant did not furnish substantiation that would

support reasonable bases for the express and implied claims actually communicated to

consumers.

208.   The defendant has the obligation to support all reasonable interpretations of its

advertisement claims.

### F.   Consumers Surveys Showing they are Materially Influenced by "Humanely Raised" Advertising Claims

209.   American consumers increasingly identify the welfare and protection of food animals as a

major area of concern as a major area of concern, both politically and as criteria for food

selection.[1]

210.   The public is willing to pay more for food that is labeled "Humanely Raised." A 2007

survey by Public Opinion Strategies found that 58 percent of consumers would spend an

additional 10 percent or more for meat, poultry, eggs, or dairy products labeled "Humanely

Raised."[2]

---

[1] The welfare and protection of animals raised for food was seen as very or somewhat important by 79 percent of respondents to a survey managed by the Humane Research Council. Humane Research Council, Animal Tracker – Wave 112 (2008), available at http://www.humaneresearch.org/content/animal-tracker-wave-1-june-2008. 73 percent responded that they would support a law requiring that farm animals, including, pigs, cows, and chickens, be provided with enough space to behave naturally.

[2] Frequently Asked Questions, American Humane Certified, http://www.humaneheartland.org/faqs (last visited Mar. 1, 2014). Additionally, consumer surveys by the Animal Agriculture Alliance in 1993, 1998, and 2004 demonstrated that American shoppers are willing to pay more for food labeled "humanely raised." In 2004, 31 percent of respondents were willing to pay 5 percent more and 23 percent were willing to pay 10 percent more. Animal Agric. Alliance & Nat'l Corn Growers Ass'n, Consumer Attitudes about Animal Welfare: 2004 National Public Opinion Survey 13(2004).

211.    Beginning in the mid-2000's, consumer preference for food from humanely treated animals created a market for products with holistic animal welfare and environmental label claims such as "Humanely Raised," "Humanely Handled," and "Sustainably Farmed," along with a variety of other claims.[3].

212.    A majority of consumers agree that food producers should not be allowed to use the claim "humanely raised" on their product labels unless the producers exceed minimum industry animal care standards.[4]

213.    Food labels are theoretically used to help consumers make educated purchasing decisions.

214.    If consumers do not know the meaning of label claims—and have no ability to access that information—an educated consumer base does not exist and companies like the defendant are able to mislead them.

---

[3] The Kroger Co.'s Simple Truth line of products, launched in 2012, includes an unverified "humane" claim on its natural chicken. The company disclosed recently that sales of the Simple Truth line have grown at an "astonishing pace." K. Nunes, Kroger's Simple Truth Simply Astonishing, MeatPoultry.com (Mar. 7, 2014).

[4] 1 Survey of Consumer Attitudes About Chicken Welfare, ANIMAL WELFARE INST. (Oct. 2020) https://awionline.org/sites/default/files/uploads/documents/SurveyConsumerAttitudesChickenW elfare.pdf. This perception of the claim has remained consistent for the past 10 years: Survey of Consumer Attitudes About Animal Raising Claims on Food (Part II), Animal Welfare Inst. (Oct. 2018) https://awionline.org/sites/default/files/uploads/documents/FA-AWI-survey-on-animal-raising-claims-Oct-2018.pdf (82% of meat, poultry, egg or dairy purchasers agree); Survey of Animal Raising Claims Used on Meat Packaging, ANIMAL WELFARE INST. (Oct. 2013) (88% of frequent meat or poultry product purchasers agree)
https://awionline.org/sites/default/files/uploads/documents/fa-meatlabelingpoll-041714.pdf; U.S. Poll on the Welfare of Chickens Raised for Meat, ANIMAL WELFARE INST. 2 (Apr. 2010) https://awionline.org/sites/default/files/uploads/legacy-uploads/documents/FA-HumanelyRaisedCagedFreeSurvey081110-1281725036-document-23248.pdf (77% of frequent chicken purchasers agree).

215.    Since consumers are becoming increasingly aware of those realities—and demonstrating

more awareness and compassion in their purchasing choices—companies like the defendant

attempt to paint a different picture of the lives of the animals than what occurs in real life.

## FIRST CAUSE OF ACTION
### (NYGBL § 349)
### (Deceptive acts and practices unlawful)

216.    The plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

217.    NYGBL § 349 declares unlawful and deceptive acts or practices in the conduct of any

business, trade, or commerce, or in the furnishing any service in the State of New York.

218.    A plaintiff who brings an action under the statute must prove three elements: first, that

the challenged act or practice was consumer-oriented; second, that it was misleading in a

material way; and third, that the plaintiff suffered injury as a result of the deceptive act.

219.    NYGBL § 349 is directed at wrongs against the consuming public, and it allows a private

right of action by any person who has been injured by a violation of the statute.

220.    In addition to the right of action granted to the attorney general, any person who has been

injured by reason of any violation of the prohibition against deceptive trade practices may bring

an action "in his or her own name to enjoin such unlawful act or practice, an action to recover his

or her damages, or both such actions."

221.    The defendant's acts and practices are directed entirely at the consuming public and the

consumer marketplace.

222.    For purposes of NYGBL § 349, deceptive or misleading representations or omissions are

defined objectively as those likely to mislead a reasonable consumer acting reasonably under the

circumstances.

223.    NYGBL § 349 is meant to empower consumers, especially the disadvantaged, to even the

playing field of their disputes with better funded and superiorly situated fraudulent businesses.

23

224. "New York law provides remedies, including private rights of action, for misbranding food under consumer protection laws, such as GBL § 349, which broadly prohibits use of 'deceptive acts or practices' in business dealings in New York." *Koenig v Boulder Brands, Inc.*, 995 F Supp 2d 274, 280-81 (SDNY 2014).

225. NYGBL § 349 is focused on a seller's deception and its subsequent impact on consumer decision-making—not the consumer's ultimate use of the product.

226. NYGBL § 349 requires a plaintiff to show that the act complained of was likely to mislead a reasonable consumer acting reasonably under the circumstances.

227. A party need not necessarily be a "consumer" or a natural person to avail itself of the statutory remedy, so long as it can show that it suffered a detriment or injury as a result of the defendant's acts or practices, and that the defendant's conduct affects the public interest, or is consumer-oriented conduct having a broad impact on consumers at large.

228. A reasonably person acting reasonably would have been materially misled by the defendant's advertising claims.

229. Reliance is not an element of a claim under the statute, nor is intent to defraud.

230. The defendant's practice of selling mislabeled and misbranded meat in this way has the capacity and tendency to deceive and mislead a significant percentage of consumers in a material way because the practice induces consumer purchases by manipulating public trust and vulnerabilities.

231. The defendant's extensive and deceptive marketing scheme of using its "Humanely Raised" representations across its product lines continues to a) reduce transparency of the real treatment of animals during the animal-production process, oftentimes also considered Concentrated Animal Feeding Operations (CAFOs); b) produce invisibility in its suppliers' treatment of animals in animal production; c) alters and maintains false and misleading

24

perceptions, beliefs and schemas relating to the real treatment of animals in animal production; and d) engages in "psychic numbing" to disconnect consumers from the realities of what takes place at CAFOs and in animal production.

232.    The plaintiff acted and acts deceptively by making the representations about its suppliers' husbandry practices over which the defendant lacks sufficient verification process.

233.    The animal abuses—that are alleged to occur belie and render false, deceptive, and misleading the defendant's advertising claims—take place behind closed doors while 93% of the population opposes the suffering of animals raised for food, and 90% oppose factory farming when asked their opinion, according to a Global Stewards public opinion survey, "*U.S. Public Opinion Survey Results on the Environment, Trade, and Campaign Finance Reform*."

234.    The plaintiff acted and acts deceptively by making the representations about its suppliers' husbandry practices when its suppliers lack accepted unbiased, minimal, third-party certification as to their husbandry practices.

235.    The defendant's advertising claims, considered in their totality, are not fairly balanced to enable reasonable consumers to make informed choices.

236.    The defendants' attempt at "humanewashing," which diverts, distracts, and detaches consumers from the realities of modern-day meat agriculture and farming is a deceptive act and practice.

237    The defendant's manipulation of font sizes to emphasize "Humanely Raised" while deemphasizing "D&W Verified" was deceptive and misleading in a material way because reasonable consumers would be misled into believing that a third-party verified the claim.

238.    Since the defendant uses "Humanely Raised" as a prominent marketing inducement in its product, reasonable consumers would believe that the defendant is able to measure, substantiate,

25

and verify that *all* (substantially all) of the animals raised or sourced were "Humanely Raised." It

is alleged that it cannot and has not.

239.     As a result of these violations of NYGBL § 349, the plaintiff is entitled to recover actual

damages, three times the actual damages up to $1,000, an injunction in the proper court, costs

and reasonable attorneys' fees pursuant to NYGBL § 349(h).

## Injunctive Relief Warranted under NYGBL § 349(h) and NYGBL § 350

240.     The New York State legislature amended both NYGBL §§ 349 and 350 to add a private

right of action for money damages, *injunctive relief* and reasonable attorneys' fees.

241.     The statute reads in relevant part:

>    General Business Law § 349     Deceptive acts and practices unlawful
>
>    ...
>
>    (h) In addition to the right of action granted to the attorney general pursuant to this
>    section, any person who has been injured by reason of any violation of this
>    section may bring an action in his own name to enjoin such unlawful act or
>    practice, an action to recover his actual damages or fifty dollars, whichever is
>    greater, or both such actions. The court may, in its discretion, increase the award of
>    damages to an amount not to exceed three times the actual damages up to one
>    thousand dollars, if the court finds the defendant willfully or knowingly violated
>    this section. The court may award reasonable attorney's fees to a prevailing
>    plaintiff.

242.     The defendant's meat products containing its "Humanely Raised" advertising claims as

alleged herein are sold at retailers all over New York, including New York City.

243.     The defendant's meat products containing its "Humanely Raised" advertising claims are

also sold online to consumers in New York through online retailers such as Amazon Fresh,

Prime Now, Instacart, Peapod, and Go Puff.

244.     Within walking distance of the plaintiff's residence, the defendant's meat products are

sold in stores where he shops, including CVS Pharmacy, Rite Aid, D'Agostino Supermarkets,

Duane Reade, Gristedes.

245.     Some stores, depending on the day and supply levels, contain at least 71 different meat products sold and marketed by the defendant.

246.     Without injunctive relief, the plaintiff will be unable to shop for basic groceries and provisions at the aforementioned stores without being confronted by the defendant's injurious, false and misleading advertising claims.

247.     The plaintiff is a consumer typically targeted at the above stores by the defendant.

248.     The plaintiff physically witnesses the falsely advertised products attempts, which are aimed at convincing him and the community of facts that are harmful, unlawful, threatening, recurring, and imminent.

249.     The defendant's false advertising claims represent negative externalities similar to environmental pollutants and nuisances.

250.     The consuming public at large—which includes the plaintiff—need not actually be "consumers" as restrictively defined in other contexts in order to suffer injury and future injury for purposes of seeking an injunction.

251.     The consuming public at large—which includes the plaintiff—need not justifiably rely on the advertising claims to be actionable for purposes of seeking an injunction.

252.     The consuming public at large—which includes the plaintiff—will suffer future detriment and injury by witnessing the false and injurious advertising claims.

253.     Without injunctive relief, the advertising claims will continue to mislead consumers into believing they are supporting a company whose practices align with their values.

254.     If allowed to continue without injunctive relief, the defendant's advertising claims will continue to reduce transparency and influence consumer decisions in ways that are contrary to public interest.

255.    If allowed to continue without injunctive relief, millions of New Yorkers will continue to

be irreparably deceived and misled on matters of important public interest such as animal

welfare, public health, and ecological soundness.

256.    New York State has a strong public interest in truthful advertising in the area of animal-

welfare advertising.

257.    The public interest of New York State outweighs the defendant's commercial need to

publish its untruthful advertising.

## SECOND CAUSE OF ACTION
### (NYGBL § 350)
### (False advertising unlawful)

258.    The plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

259.    False advertising in the conduct of any business, trade, or commerce or in the furnishing

of any service is unlawful.

260.    The statute applies to virtually all economic activity, and New York courts apply the

statute broadly.

261.    The term "false advertising" means advertising, including labeling, of a commodity, or of

the kind, character, terms, or conditions of any employment opportunity if such advertising is

misleading in a material respect. NYGBL § 350-a (False advertising).

262.    As alleged in the negligence and gross negligence causes of action below, the defendant

owed a statutory duty to the plaintiff under Agriculture and Markets Law § 199-a et seq. to not

"produce, process, pack, transport, possess, sell, offer or expose for sale" any "article of food,"

which is "misbranded."

263.    Under Agriculture and Markets Law § 201, "Food shall be deemed to be misbranded" if

"[i]f its labeling is false or misleading in any particular..."

264.    Furthermore, under Agriculture and Markets Law § 202-a,[5] the use of an advertisement concerning a food or a food product is prohibited if the advertisement is false or misleading in any particular.

265.    The term "advertisement" under the Agriculture and Markets Law, means all representations disseminated in any manner or by any means, other than by labeling, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of a food or food product.[6]

266.    The defendant's claims on its website, consistent with the above representations, claim, "we advocate for animal welfare," which is an "advertisement" as defined by Agriculture and Markets Law § 198.

267.    In determining whether any advertising is misleading, there must be taken into account (among other things) not only representations made by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity which the advertising relates, under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

268.    The defendant's violations of both state and federal laws and regulations, which are violations of its statutory standards of care, represents *per se* false advertising.

269.    The defendant's violations of both state and federal laws and regulations, which are violations of its statutory standards of care, represents substantial evidence of false advertising.

---

[5] 1. Agriculture and Markets Law § 202-a (False advertising): "An advertisement concerning a food or food product shall not be false or misleading in any particular."

[6] Agriculture and Markets Law § 198 Definitions

270.    The above statutory standards of care were designed to promote consumer choice, which

the defendant is depriving through its false and misleading advertising.

271.    The defendant's advertising claims directly violate the statutes' purposes, and continue to

cause direct harm to the group that the standards were designed to protect.

272.    The farms from which the defendant sources its animals are themselves antithetical to

animal welfare. To claim that its practices "promote" animal welfare is false using any

reasonable construction of logic.

273     The defendant uses its false representations to convince consumers that a growing

concern—animal inhumaneness—is not real in its suppliers' animal-production facilities when

such animal inhumaneness is real.

274.    The defendant uses its false representations to psychologically distort, distance, and

detach consumers from reality to induce sales for profit.

275.    Since the defendant's commercial advertising claims are false and misleading, they

deserve no First-Amendment protection.

276.    As a result of these violations of NYGBL § 350, the plaintiff is entitled to enjoin the

defendant's unlawful advertising, or recover actual damages or $500, which is greater, or both,

the court may award reasonable attorney's fees to the prevailing plaintiff. Additionally, the court

may, in its discretion, increase the award of damages to an amount not to exceed three times the

actual damages, up to $10,000.00, if the court finds that the defendant willfully or knowingly

violated the statute.

## THIRD CAUSE OF ACTION
### (Negligence)

277.    The defendant owed a statutory duty to the plaintiff under Agriculture and Markets Law §

199-a et seq. to not "produce, process, pack, transport, possess, sell, offer or expose for sale" any

"article of food," which is "misbranded."

30

278. Under Agriculture and Markets Law § 201, "Food shall be deemed to be misbranded"..."[i]f its labeling is false or misleading in any particular."

279. Agriculture and Markets Law § 199-a et seq. is a statutory scheme aimed at protecting the plaintiff who is in a distinct class of persons of consumers who would likely be induced, directly or indirectly, to purchase the defendant's food product.

280. Agriculture and Markets Law § 199-a et seq. prohibiting sale of misbranded food was enacted within scope of police power of state to safeguard public against misrepresentation or deception in its sale. Carey v. Standard Brands, Inc., 1959, 16 Misc.2d 874, 189 N.Y.S.2d 1019.

281. Agriculture and Markets Law § 199-a et seq. has two general purposes: 1) the prevention of the manufacture and sale of food which is injurious or deleterious; and 2) the safeguarding of the public against misrepresentation or deception.

282. The plaintiff was within the scope of statutory protection under Agriculture and Markets Law §§ 199-a et seq. and 201 et seq.

283. Liability of damages for violation of Agriculture and Markets Law § 199-a, which is for the general benefit of public, is based upon negligence. Salzano v. First Nat. Stores 268 A.D. 993, 51 N.Y.S.2d 645 (2 Dept. 1944).

284. Violation of this article relating to sale of adulterated food is "*negligence per se*". Catalanello v. Cudahy Packing Co., 1941, 27 N.Y.S.2d 637, affirmed 264 A.D. 723, 34 N.Y.S.2d 37, appeal denied 264 A.D. 779, 35 N.Y.S.2d 726.

285. Agriculture and Markets Law § 200 et seq. dealing with adulteration or misbranded food creates an absolute duty of manufacturer or seller for benefit of general public and privity of contract is not essential. *See* Alphin v. La Salle Diners, 197 Misc. 415, 98 N.Y.S.2d 511 (1950).

286. The defendant's breach of its duty under Agriculture and Markets Law § 99-a et seq. did in fact induce the plaintiff to purchase the product.

31

287.   The defendant's breach of its duty under Agriculture and Markets Law § 199-a et. seq. was a substantial factor in causing the plaintiff's injuries, which were proximately caused by the defendant's breach.

288.   The defendant owed a statutory duty to the plaintiff under Agriculture and Markets Law § 202-a et. seq., to not use false and misleading advertising claim(s) if they were likely to induce, directly or indirectly, the purchase of its food product labeled as Exhibit 1.

289.   The defendant breached that duty by using the advertising claims as set forth in this complaint.

290.   Agriculture and Markets Law § 202-a et. seq. is a statutory scheme aimed at protecting the plaintiff who is in a distinct class of persons of consumers who would likely be induced, directly or indirectly, to purchase the defendant's food product.

291.   The plaintiff was within the scope of statutory protection under Agriculture and Markets Law § 202-a et. seq.

292.   The breach of Agriculture and Markets Law § 202-a et. seq. carries civil penalties.

293.   The defendant's breach of its duty under Agriculture and Markets Law § 202-a et. seq. represents negligence *per se*.

294.   The defendant's breach of its duty under Agriculture and Markets Law § 202-a et. seq. represents evidence of negligence.

295.   The defendant's breach of its duty under Agriculture and Markets Law § 202-a et. seq. did in fact induce the plaintiff to purchase the product.

296.   The defendant's breach of its duty under Agriculture and Markets Law § 202-a et. seq. was a substantial factor in causing the plaintiff's injuries, which were proximately caused by the defendant's breach.

297.     The defendant owed statutory duties to the plaintiff under NYGBL §§ 349 and 350 as
alleged.

298.     Both NYGBL §§ 349 and 350 are statutory schemes aimed at protecting the plaintiff who
is in a distinct class of persons of consumers who would likely be deceived by the defendant's
acts, omissions, and false advertising.

299.     The defendant's breach of its duties under NYGBL §§ 349 and 350 materially misled the
plaintiff to purchase the product.

300.     NYGBL §§ 349 and 350 both carry private causes of action and civil penalties.

301.     The defendant's breach of its duties under NYGBL §§ 349 and 350 represents negligence
*per se*.

302.     The defendant's breach of its duties under NYGBL §§ 349 and 350 represents evidence
of negligence.

303.     The defendant's breach of its duties under NYGBL §§ 349 and 350 were a substantial
factor in causing the plaintiff's injuries, which were proximately caused by the defendant's
breaches.

## FOURTH CAUSE OF ACTION
### (Gross Negligence/Willful Misconduct)

304.     The plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

305.     The defendant's conduct rises to the level of gross negligence and willful misconduct
because of the repeated, high-volume, and intentional nature of its broad marketing scheme,
which is aimed at the public generally.

306.     The defendant's calculated intent to violate and subvert state and federal laws,
regulations, and guidance in order to exploit consumer vulnerabilities reflects a higher level of
culpability than ordinary negligence.

307.    The defendant's false and misleading mislabeling and misbranding practices, in violation

of state and federal laws, regulations, and guidance represents an intentional failure to perform a

manifest duty to the public.

308.    The defendant possesses superior knowledge of the facts and practices that it knows to be

the opposite of, or a material departure from, what it advertises.

309.    The defendant uses deception and deceit to lure in consumers who hold heightened

concerns about animal humanness in the animal-production process, and then betrays those same

customers by selling them products containing false and misleading promises.

310.    Upon information and belief, the defendant factors into its business model matters like

this case in order to sell its offending products to millions of consumers who lack sufficient

awareness to contest the defendant's affirmative misrepresentations.

311.    The defendant exhibits a wanton and heedless indifference to the consequences of

deceiving millions of New York consumers into believing that their hard-earned money supports

a cause that aligns with their values.

312.    The defendant's intentional "humanewashing" continues to a) reduce transparency of the

real treatment of animals during the animal-production process; b) produce invisibility in its

suppliers' treatment of the subject animals in the meat-production process; c) alters and

maintains false and misleading perceptions, beliefs and schemas relating to the real treatment of

the subject animals; and d) engages in "psychic numbing" to disconnect consumers from the

realities of what takes place animal-production facilities, some of which are CAFOs.

313.    The defendant intentionally, recklessly, and wantonly commits these acts repeatedly

knowing that this conduct would probably result in injury or damage.

34

314. The defendant's misrepresentations are particularly egregious during a time of multiple public-health crises related to meat consumption, including heightened rates of cancer, heart disease, and diabetes, combined with the Coronavirus Pandemic, a zootonic pathogen.

315. A separate and distinct injury occurs at each sale and at each viewing of the defendant's products that contain the false and misleading claims as alleged herein.

316. Pecuniary injuries to consumers include prices and premiums paid for the products.

317. Non-pecuniary injuries to consumers also included those experienced by the plaintiff as alleged below.

318. All injuries were and are proximately caused by the defendant's acts and omissions as alleged herein.

## The Plaintiff's Injuries and Damages

319. The plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

320. As a result of the defendant's advertising claims, the plaintiff was caused to feel shock, guilt, helplessness, shame, indignation, mental anguish, anger, betrayal, stress, frustration, torment, and outrage, which have led to sleep disturbances, difficulty concentrating, irritation, and disruption to emotional well-being.

321. The defendant is responsible for the injuries it causes as well as the aggravation of any pre-existing injuries.

323. The defendant is responsible for any aggravated injuries regardless if the plaintiff had a heightened susceptibility to the defendant's acts and omissions.

324. The price that the plaintiff paid for the product represents a financial injury.

325. The premium that the plaintiff paid, or the price above what the defendant's competitors charge without committing the acts and omissions alleged, represents a financial injury.

35

326. The plaintiff, an actively practicing attorney, is taking time away from his law practice to research, investigate, and draft litigation documents related to this action *pro se*.

327. The plaintiff respectfully requests the recovery of reasonable attorney's fees related to that lost time under NYGBL § 349(h).

## Preemptive Law is Inapplicable

328. The defendant may not avert liability on preemption grounds.

329. The plaintiff's claims are not premised on an ingredient or labeling challenge that would come within the exclusive purview of the PPIA, FMIA, USDA, or any other federal law or Act.

330. Any purported pre-approval by the FSIS or USDA represented nonbinding guidance and does not preempt the plaintiff's claims pursuant to governing law of the United Stated Supreme Court and governing law of the Second Circuit of the United States.

331. Upon information and belief, any documentation or substantiation that the defendant or its suppliers have submitted to the FSIS in support of its animal-welfare representations were deficient, misleading, and materially false.

332. Congress has not expressly or impliedly expressed its intent to exclusively occupy the area forming the basis of the plaintiff's claims, or impair New York State's policing power, especially as to the civil remedies sought in this action.

333. There is no conflict between the plaintiff's claims and all applicable federal laws and acts that would deprive the plaintiff from bringing this action.

## DEMAND FOR JURY TRIAL

Pursuant to Civil Practice Law and Rules § 4102 demands a trial by jury as to all issues so triable.

**WHEREFORE**, the plaintiff demands judgment against the defendant:

1. For the sum of $250,000.00 plus interest from October 12, 2021, plus costs and disbursements;

36

Case 1:21-cv-10549-MKV   Document 1-1   Filed 12/09/21   Page 38 of 41

2.    Enjoining and restraining the defendant, its agents, servants and employees, and
      any other person acting in its name and stead, permanently from distributing,
      marketing, selling, and offering for sale in the State of New York the products
      referred to, and labeled as "D&W HUMANELY RAISED" as alleged in this
      complaint while and as long as the labeling of said products occurs;

3.    Reasonable attorneys' fees under NYGBL § 349(h) to be determined at a hearing;
      and

4.    For such further and other relief as may be just.

Dated: November 13, 2021

Defendant's address:

Jesse Langel, Esq.
*Pro se*
Dietz & Watson, Inc.                      30 Wall Street, 8th Floor
5701 Tacony Street                        New York, NY 10005
Philadelphia, PA 19135                    646-290-5600

Case 1:21-cv-10549-MKV   Document 1-1   Filed 12/09/21   Page 39 of 41

## **VERIFICATION**

Jesse Langel, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Jesse Langel

Sworn to before me this 13th day of November, 2021

Notary Public

Shyam D. Buxani
Notary Public, State of New York
Registration No. 01BU6144080
Qualified in New York County
Commission Expires April 24, 2022



Case 1:21-cv-10549-MKV   Document 1-1   Filed 12/09/21   Page 41 of 41

